NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 54, HOTEL EMPLOYEES & RESTAURANT EMPLOYEES INTERNATIONAL UNION, AFL–CIO, Respondent.

No. 89–3170.

United States Court of Appeals, Third Circuit.

Argued Sept. 7, 1989.

Decided Oct. 5, 1989.

Rehearing and Rehearing In Banc Denied Nov. 1, 1989.

Carmel P. Ebb (argued), N.L.R.B., Washington, D.C., for petitioner.

Bernard N. Katz (argued), Meranze & Katz, Philadelphia, Pa., for respondent.

Before MANSMANN, NYGAARD and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

This is another in a line of recent cases before the National Labor Relations Board presenting the issue of whether union members, who wish to cross a picket line, may do so without fear of union discipline if they first unilaterally change their membership from "full" to "financial core" status. Financial core membership permits an employee to maintain a dues-paying association with the Union that will protect him or her against the threat of discharge under Section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), without subjecting him to the responsibilities and regulations of full membership.

We must decide whether a union violates Section 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A), by refusing to recognize financial core as a permissible form of union membership and then imposing disciplinary fines on bargaining unit employees who cross a picket line and return to work after notifying the union that they wish to change their status from full to financial core membership.

At issue are two competing policies contained in the Labor Act. One national policy holds that a union functioning as a representative of a group of employees may need both their financial support and some means of controlling dissident elements if is to fulfill most effectively its role as the exclusive representative of the entire group. See *Hershey Foods Corp.*, 207 NLRB 897, 903 (1973). Another policy is expressed by specific statutory language: "Employees ... have the right to refrain from any and all ... activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment...." 29 U.S.C. § 157. When membership in a union is required as a condition of employment, a tension results if the

employee should desire to invoke his Section 7 right to refrain from a concerted activity such as a strike. It is the Union's contention that the employee in such a case must either remain a member of the Union and expose himself to the possibility of union discipline or resign from the Union and subject himself to the loss of his job.

Before us is the application of the Board for enforcement of an order issued on November 30, 1988, against Local 54, Hotel Employees and Restaurant Employees International Union, AFL–CIO. We have jurisdiction under 29 U.S.C. 160(e). The Board certified that its order in the unfair labor practice proceedings is a final order within the meaning of Section 10(e) of the Act. Appeal was timely filed under Rule 4(a), Fed.R.App.P.

The standard of review gives the Board's determinations great deference both as to conclusions of law and findings of fact. The Board's conclusions of law are entitled to respect if based upon a reasonably defensible construction of the Act. *NLRB v. United Food & Commercial Wkrs. Local 23*, 484 U.S. 112, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987); *Pattern Makers' League v. NLRB*, 473 U.S. 95, 100, 105 S.Ct. 3064, 3067, 87 L.Ed.2d 68 (1985). The Board's findings of fact must be sustained if they are supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–91, 71 S.Ct. 456, 463–66, 95 L.Ed. 456 (1951); *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812–813 (3d Cir.1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2461, 95 L.Ed.2d 870 (1987).

## I.

The facts are not in dispute. The Respondent–Union, Local 54, Hotel Employees & Restaurant Employees International Union, AFL–CIO, admits that it rejected appeals by certain members for financial core status before those members refused to honor a strike and returned to work. The Union predicated the rejection on the theory that financial core status is not recognized explicitly in the Union constitution or by-laws. The Union brought internal

disciplinary charges against many of the non-striking members and many were fined for having crossed the picket line. The Board challenges each of these actions as violative of Section 8(b)(1)(A) of the Act.

The employer is Elsinore Shore Associates, trading as Atlantis Casino Hotel. It is a New Jersey partnership engaged in the operation of the hotel and casino in Atlantic City, New Jersey, the sole facility involved in this proceeding. The Union represents the employees of the Atlantis Casino Hotel.

The Employer and the Union were parties to a collective-bargaining agreement with a term of September 15, 1983 to September 15, 1988. That agreement included a wage reopener clause. On September 2, 1987, a picket line was established to further the Union's economic demands during the interim negotiations. The unexpired collective-bargaining agreement remained in force throughout the strike. On various dates between September 29, 1987 and February 1, 1988, when the pickets were withdrawn, more than one hundred bargaining unit employees dishonored the picket line and returned to work. Before doing so, each forwarded to the Union the following letter:

> I am an employee of Atlantis Casino Hotel in Atlantic City, New Jersey. This letter will serve as notification that I am changing my membership status in Local 54, Hotel Employee and Restaurant Employees (H.E.R.E.) International Union from that of a "full" member to that of a "financial core" member. As a "financial core" member, I will continue to pay to the union all initiation fees and dues uniformly required of all members of maintaining membership. I am not resigning from the union, I am only changing my membership status. I will not, henceforth, be subject to any obligations of membership other than that of paying uniformly required dues and initiation fees required of all Local 54 H.E.R.E. members.

App. at 13–14A.

Before taking that step, all were members of the Union in good standing, with no arrearages in their dues obligation. All were covered by the following union security provision in the existing collective-bargaining agreement:

> It shall be a condition of employment that all employees covered by this agreement who are members in good standing in the Union on the effective date of this Agreement shall remain members in good standing and those who are not members on the effective date of this Agreement shall, on or after the 30th day following the execution of this Agreement, become and remain members in good standing in said Union. In the event that any employee fails to comply with the requirements of this section, the Employer shall discharge said employee within seven (7) days of receipt of written demand.

App. at 14A. After returning to work the self-styled "financial core" members continued to satisfy their financial obligations to the Union.

The "financial core" membership concept derives from a series of statements contained in Supreme Court cases summarized in *Pattern Makers' League v. NLRB*, 473 U.S. 95, 106 n. 16, 105 S.Ct. 3064, 3071 n. 16, 87 L.Ed.2d 68 (1985):

> Under § 8(a)(3), the only aspect of union membership that can be required pursuant to a union shop agreement is the payment of dues. See *Radio Officers v. NLRB*, 347 U.S. 17, 41 [74 S.Ct. 323, 336, 98 L.Ed. 455] (1954). (union security agreements cannot be used for "any purpose other than to compel payment of union dues and fees"). " 'Membership,' as a condition of employment, is whittled down to its financial core." *NLRB v. General Motors Corp.*, 373 U.S. 734, 742 [83 S.Ct. 1453, 1459, 10 L.Ed.2d 670] (1963). See also *Ellis v. Railway Clerks*, 466 U.S. 435 [104 S.Ct. 1883, 80 L.Ed.2d 428] (1984). (under the Railway Labor Act, employees in a "union shop" cannot be compelled to pay dues to support certain union activities). Therefore, an employee required by a union security agreement to assume financial "membership" is not subject to union discipline.

Such an employee is a "member" of the union only in the most limited sense.

Neither the Union's constitution and its by-laws, nor the collective bargaining agreement differentiates between full membership and "financial core membership." These documents neither mention, nor authorize any limited form of membership. The timely payment of dues and initiation fees constitutes the only condition for the privilege of full membership. Consistent therewith, the Union responded to most of those who sought financial core status, as follows:

> We have received your letter ... in which you advise that you seek to alter your membership in this Union to that of a "financial core" member. Under the Constitution and By-laws of this Union there is no provision for "financial core" affiliation. The only level of affiliation which exists is that of a full member based on the payment of required dues and initiation fees. In this regard you should note that the question of whether the Constitution and By-laws of the Union should be altered or amended to permit financial core membership has been considered by the Executive Board and General Membership and rejected.
>
> Accordingly, please be advised that your request for financial core status must be denied. You are at this juncture still deemed to be a full member of this Union and accordingly bound by the terms and conditions of its By-laws and all obligations arising thereunder. If you have any questions concerning this matter, please do not hesitate to contact this office.

App. at 14A.

Thereafter, most of the nonstrikers received notification that intra-union charges were being brought against them because they crossed the picket line. Additionally, after notice and hearing, almost half were notified by the Union that they had been deemed guilty of the charges and fined in amounts ranging from $50 to $1500.

## II.

Our task here is very important. Supreme Court precedent has permitted union members to resign and then cross a picket line and thereby absolve themselves of union fines and other disciplinary action. See *Pattern Makers; NLRB v. Textile Workers*, 409 U.S. 213, 93 S.Ct. 385, 34 L.Ed.2d 422 (1972). We must decide whether it is appropriate to extend immunity from union disciplinary action to those members who do not resign, but change their relationship in the union to mere financial core status. The Board has been willing to do this. It has extended this precept and has absolved union members from the risk of fines and disciplinary action where the members have assumed "financial core" status before crossing the picket lines. *Carpenters Local 470* (Tacoma Boatbuilding), 277 NLRB 513 (1985) and *Carpenters District Council* (Gordon Construction), 277 NLRB 530 (1985). This case requires us to decide whether the Board had the authority to do this. Before us the union vigorously takes two positions: first, that *Tacoma Boatbuilders* and *Gordon Construction* were incorrectly decided. It argues that the cases improperly limit the power of a labor union to enforce strike discipline by giving union members the right to dilute the critical concept of concerted action as an economic weapon in the bargaining process. Alternatively, it contends that even if those holdings were proper, the material facts here differ from those there.

The Board determined that the Union violated Section 8(b)(1)(A) by denying employees the right to change their membership status and thereafter by threatening to discipline and disciplining these employees because they crossed the picket line and returned to work. They predicated this determination on settled Board authority. The Union argues that the Board action intrudes upon purely internal union matters and that it denies to the union fruits of collective bargaining by failing to observe differences between union security and agency shop agreements. This argument requires us to review relevant Supreme Court teachings in this sensitive area that delineate the distinctions between rights of a union vis a vis its members and the rights of members vis a vis their union.

### III.

As a general rule, under the provisions of Section 7, employees are free to decide for themselves whether they wish to support a strike or cross a picket line and report to work. 29 U.S.C. § 157. The Act insulates them from intimidation in making that determination. Yet employees who elect to break a strike while purporting to retain full union membership may expose themselves to certain consequences. They fall within a narrow exception to the general guarantee. In *NLRB v. Allis–Chalmers Mfg. Co.*, 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967), the Court held that unions may legitimately enforce strike solidarity by fines and explusion against members who dishonor a lawful strike and return to work. Discipline in those circumstances was deemed to be consistent with the 8(b)(1)(A) proviso which exempts from regulation the right of a labor organization "to prescribe its own rules with respect to the acquisition or retention of membership therein." 388 U.S. at 178, 87 S.Ct. at 2005 (citation omitted).

Five years after its decision in *Allis–Chalmers*, the Court added a new gloss to its teachings. It determined that a labor organization's prerogatives in this respect are limited strictly to active, current union members. In *NLRB v. Textile Workers*, 409 U.S. 213, 93 S.Ct. 385, 34 L.Ed.2d 422 (1972), the Court held that a labor organization could not lawfully discipline a member who resigned prior to crossing a picket line. Later, the Court narrowed further the permissible reach of internal discipline. In *International Assoc. of Machinists & Aerospace Workers, Local Lodge 1414*, 270 NLRB 1330 (1984), the Board decided that union members have the unfettered right to resign and that union restrictions on that process are a nullity. This view was affirmed by the Court in *Pattern Makers, supra.* The Court agreed that such restrictions "are invalid and do not justify imposing sanctions on employees who have attempted to resign from the Union." *Id.* 473 U.S. at 100, 105 S.Ct. at 3067–68. Accordingly, the Court concluded that "[Section] 8(b)(1)(A) properly may be construed as prohibiting the fining of employees who have tendered resignations ineffective under a restriction in the union constitution." *Id.* Thus, the task before us is to decide if the Board may take the additional step of prohibiting the union from imposing fines on a member who has not resigned, but has elected to take the status of "financial core" even though that status is not reflected *ipsissimis verbis* in the Union's constitution or by-laws.

### IV.

The Union argues that it acted within lawful perimeters and did nothing more than what *Allis–Chalmers* permits. To be sure, the general rule is that a labor organization may lawfully invoke internal disciplinary machinery against full members, who remain in that capacity and have violated internal rules. The Union argues that this is precisely what has occurred here because the involved employees had not "resigned from union membership." It also claims that resignations were not restricted by internal rules and they would not have rejected resignations if duly tendered. In essence, Local 54 claims that its sole vice was the refusal to recognize "financial core membership." Because no resignations were implicated here, it argues that the prohibition of *Pattern Makers* does not apply.

Yet, we must recognize that *Allis–Chalmers* addressed neither the rights of members who resigned nor, as we have here, the rights of members who assumed a membership status less than full membership. Nor did *Scofield v. NLRB*, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969) address this question. There the Court held that those who remained members while violating union regulations are vulnerable to legitimate discipline. However, in its discussion the Court fashioned an "escape hatch." It set forth three conditions for lawful enforcement of an internal union regulation: "Section 8(b)(1)(A) leaves a union free to enforce a properly adopted rule which reflects a legitimate union interest, impairs no policy Congress has embedded in the labor laws, and is reasonably

enforced against union members *who are free to leave the union and escape the rule.*" 394 U.S. at 430, 89 S.Ct. at 1158 (emphasis supplied). Consistent with this "escape" requirement, the Court in 1972 in *NLRB v. Textile Workers,* commented that "the vitality of § 7 requires that the member be free to refrain in November from the actions he endorsed in May...." 409 U.S. at 217–18, 93 S.Ct. at 387. Again, 13 years later, in *Pattern Makers,* the Court condemned "union restrictions on the right to resign [as] inconsistent with the policy of voluntary unionism." 473 U.S. at 104, 105 S.Ct. at 3070.

### V.

The Board obviously has seen in these recent pronouncements an emphasis on "voluntary unionism." This policy does not reduce the power of a union to call a strike. But it does place upon the union the important responsibility to convince its members that the proposed strike is essential and is properly justified. This obligation requires the union's officers and the promoters of the strike in the democratic process to ensure widespread support of the strike action in order to forestall subsequent resignations or conversions to "financial core" membership. Thus, the concept of union solidarity is not threatened or diluted. Instead, it places upon the union leadership the very important duty to test the waters carefully to ensure that there is substantial support for a proposed strike action.

As stated before, the Board's philosophy is reflected in *Carpenters Local 470* (Tacoma Boatbuilding), 277 NLRB 513 (1985) and *Carpenters Dist. Council* (Gordon Construction), 277 NLRB 530 (1985), where the Board allowed employees to remain members and yet assume financial core status, and thereafter be exempt from union penalties. In these cases, Section 8(b)(1)(A) violations were predicated upon enforcement of strike solidarity rules against union members who, before crossing the picket line, clearly communicated their intent to become financial core members. In *Tacoma Boatbuilding,* the employees notified the union that they were not resigning from membership, but as a

"financial core members" they would not "henceforth, be subject to any obligations of membership other than that of paying uniformly required, dues and initiation fees...." 277 NLRB at 513. The Board held that such a letter was sufficient to establish financial core status, and further that such members could not lawfully be subjected to union discipline. These decisions seem to be ample Board precedent for the decision here.

### A.

Nonetheless, the Union would have us reject or distinguish these cases because "they involve situations where there was no collective-bargaining agreement in effect." It argues that if the Union and Employer wished to provide for "financial core" or any other type of less-than-full membership, the time to do so would have been during their contract negotiations. Brief for Respondent at 16. However, it would seem that if financial core members are immune from discipline where their offensive conduct relates to renegotiation of an expired contract, surely, that protection should not be lost where the strike is pursuant to a mid-term wage reopener. The coercive impact of union discipline upon Section 7 rights should be the same in either case.

The Union argues that the existence of a viable, presently enforceable union shop agreement tips the scales in its favor. But again it would seem that such an agreement heightens the case for financial core immunity. The problem was addressed in *Tacoma:*

> [W]hen there is a union security clause in effect an employee must retain financial core status as a condition for employment. To then say, however, that a financial core member is subject to the same discipline as a full member is to render meaningless the third part of the *Scofield* test, namely that a member is free to leave the union and escape the rule.

277 NLRB at 514. In *Gordon Construction,* the Board added:

> [F]inancial core membership permits an employee to maintain a dues-paying association with the union that will protect

him against the threat of discharge under Section 8(a)(3) of the Act when the collective-bargaining agreement contains a union-security provision.... If the designation of financial core or dues paying only membership is to impart any significance then it must be recognized that it does not rise to the level of full membership for all purposes, but rather is a limited affiliation which excludes the employee from certain rights accorded to full members and also removes him from the reach of union fines.

277 NLRB at 531 (relying on *Hershey Foods Corp.*, 207 NLRB 897 (1973), enforced, 513 F.2d 1083 (9th Cir.1975) (footnote omitted)).

### B.

According to the Board, the Union's construction of the union shop arrangement would limit the unwitting member to two choices: to support the strike or to resign from full membership and risk discharge. To be sure, the spectre of job loss inherent under a union shop arrangement would offer a forceful medium for compelling obedience to union strategy. Yet if striking members enjoy a statutorily protected right to change their minds and return to work after communicating their resignations, that choice ought be, and is free of job loss constraints. Indeed, the Labor Act defines as an unfair labor practice any action of a union that might cause an employer to discriminate against an employee "on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership...." 28 U.S.C. § 158(b)(2).

The Union further argues that this theory allowing financial core membership regardless of whether it is provided in the union shop agreement interferes with the process of collective bargaining. In this respect, the Union contends that *Tacoma Boatbuilding* obliterates the distinction between union shop and agency shop agreements, thus diminishing the choices available in collective bargaining and rendering meaningless a Union's successful negotiation of a union shop clause, a mandatory bargaining subject.

However persuasive the Union's arguments would have been had this court been operating on a clean slate, we cannot be persuaded by them because the Supreme Court has already spoken in this field. First, the only aspect of union membership that can be required pursuant to a union shop agreement is the payment of dues. Second, membership as a condition of employment has been whittled down to its financial core. Third, a distinction exists between full membership and financial core membership. Fourth, an employee required by a union security agreement to assume financial core "membership" is not subject to union discipline. *See Pattern Makers' League v. NLRB*, 473 U.S. 95, 106 n. 16, 105 S.Ct. 3064, 3071, n. 16, 87 L.Ed.2d 68 (1985) (citing *Radio Officers v. NLRB*, 347 U.S. 17, 41, 74 S.Ct. 323, 336, 98 L.Ed. 455 (1954); *NLRB v. General Motors Corp.*, 373 U.S. 734, 742, 83 S.Ct. 1453, 1459, 10 L.Ed.2d 670 (1963); *Ellis v. Railway Clerks*, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984)).

### VI.

Upon consideration of all contentions raised by the petitioner, the order of the National Labor Relations Board will be enforced.