320 F.2d 584
 Wallace PERRY, Trustee in Bankruptcy of the Estate of Thrift
Savings, an Arizona corporation, Bankrupt, Appellant,
v.
CERTIFICATE HOLDERS OF THRIFT SAVINGS, an Arizona
corporation, Appellees.
 No. 18251.
 United States Court of Appeals Ninth Circuit.
 July 3, 1963.
 
 Aldrich, Mirkin & Murphy, Melvin J. Mirkin, and Charles R. Johnston, Phoenix, Ariz., for appellant.
 Robert G. Mooreman, Phoenix, Ariz., for appellee.
 Before HAMLIN, JURTBERG and DUNIWAY, Circuit Judges.
 DUNIWAY, Circuit Judge.
 
 
 1
 In this hard case, we are asked to make what we consider to be bad law. We feel compelled to decline to do so. The problem arises from the bankruptcy of a corporation called Thrift Savings. It turned out that the name was a gross misdescription of the actual functioning of the corporation. It is an Arizona corporation, having an authorized capital stock of $60,000,000 divided into 6,000,000 voting shares of the par value of $10 each. Its purposes as stated in its articles of incorporation are to issue 'book plan investment certificates,' to borrow money and pay interest thereon and premiums therefor, and to invest in notes secured by mortgages of real and personal property and various other types of securities. The articles of incorporation are those of an ordinary business corporation.
 
 
 2
 The present contest involves the rights of persons to whom the corporation had issued its 'book plan investment certificates.' At the time of the bankruptcy, there were outstanding some 203 of these certificates, having a total face value in excess of $400,000. The holders of the certificates were listed in the bankrupt's schedules as unsecured creditors. The notice of first meeting of creditors was mailed to all holders of certificates, as well as to other creditors, on March 24, 1960, and the first meeting of creditors was called for April 6, 1960. By October 6, 1960, when the time to file creditors' claims expired (11 U.S.C. 93, sub. n), only 115 holders of these cretificates had filed claims. No order extending the time in which to file claims was ever entered, but, over four months later, on February 23, 1961, the referee sent out a notice of a continued meeting of creditors to be held on March 20, 1961, which notice also stated that all creditors or other persons who held passbooks which had not been filed with the court must file said claims with the referee on or before March 20, 1961. Forty-nine additional certificate holders filed claims by March 20, 1961. Two others filed claims after that date, and thirty-seven others did not file claims at all. The debts due to persons other than certificate holders are small. If the claims of those who filed more than six months after the first meeting of creditors and of those who did not file at all are disallowed, then those who have filed within the six months will receive a distribution approximately double what they would receive if the available moneys are distributed pro rata to all certificate holders.
 
 
 3
 The referee concluded that the holders of book plan investment certificates were, in effect, owners of the corporation, not creditors, and were therefore not required to file claims. The district court affirmed this order, and the trustee, on behalf of the creditors who have filed claims, appeals. We conclude that the trustee's position, namely, that the holders of certificates are creditors, is correct.
 
 
 4
 1. The certificate holders are creditors.
 
 
 5
 Counsel for certificate holders who filed late or did not file urges that such holders are owners and not creditors. This makes it necessary to state briefly the nature of the contract that they made with Thrift Savings. As we have indicated, the articles of incorporation provide for but one class of stock. While the articles use the impressive figure of $60,000,000 capital, the fact is that but 2500 shares, having a par value of $10 each, were ever issued. Under the articles, only the holders of these shares can vote, and there is no provision in either the articles or in any other document that has been brought to our attention which gives to the holders of book plan investment certificates any voting rights, or indeed any of the other normal rights of a share holder, whether preferred or common.
 
 
 6
 The company issued what it called an 'offering circular' in which it offered.$39,597,550.66 book plan investment certificates, $1 or more per unit, bearing interest at 6% Per year, compounded semiannually. The circular stated that not more than $40,000,000 worth of such certificates would be sold. Article X of the articles of incorporation provides that the highest amount of indebtedness or liability, direct or contingent, to which the corporation is at any time to subject itself, shall not exceed $40,000,000. The circular stated: 'By this offering, Thrift Savings proposes to obtain funds for use in its business through the sale of book plan investment certificates, as described herein, which may be purchased in any amount of $1.00 or more.' It the recited that it was proposed to use the funds principally for real estate, corporate and consumer financing. It continued:
 
 
 7
 'No stock of the corporation is available for sale to the public and owners of book plan investment certificates do not share corporate profits.
 
 
 8
 'Book plan investment certificates bear interest at the rate of not less than 4% A year compounded semiannually on January 1 and July 1 of each calendar year, provided that payment has been made and allowed to remain at least thirty (30) days prior to any such interest date. The current approved interest rate is 6% And will remain at 6% Unless adjusted by corporate action effective for any future period after the next succeeding interest date.'
 
 
 9
 There was a further provision that the company would 'repurchase certificates upon application by the holders * * * who shall have the right to file with the company their written application therefore, in part or in full, at any time.' The company also had the option to repurchase' any certificate on demand. There was a further provision that if immediate payment were not made, then the company would make such repurchases by numbering the written applications received and would either pay the holder as requiested, or, after the expiration of the full calendar month next succeeding the receipt of the application, apply at least one-half of the net receipts of the company from 'sales' of book plan investment certificates and 'liquidation of an investment' to the repurchase of certificates, in numerical order. This obligation to each certificate holder was limited to $1,000, after which his application was to be renumbered and placed at the end of the list of applications. The company could redeem any certificate, in whole or in part, on any interest payment date, by paying the principal sum to be redeemed plus accrued interest thereon, but only upon the company's giving notice in writing of at least thirty days.
 
 
 10
 The offering circular also contained balance sheets. The December 31, 1958 balance sheet, under the general heading 'LIABILITIES AND STOCKHOLDERS' EQUITY,' listed the following:
 
 
 11
 'Current liabilities' . . .
 
 
 12
 'Thrift accounts . . . $289,351.11'
 
 
 13
 The May, 1959 balance sheet listed under the general heading 'LIABILITIES':
 
 
 14
 'THRIFT ACCOUNTS (deposits) . . . $489,091.10'
 
 
 15
 There was also a December 31, 1958 statement of income and expenses which showed under expenses:
 
 
 16
 'Interest on Thrift Certificates . . . $7,790.19'
 
 
 17
 The actual book plan investment certificate was made to look as much as possible like a savings bank passbook, and was indeed labeled 'Passbook' on the cover. On the inside of the cover, in capital letters, was this language: 'This is a book plan investment certificate. This is not a certificate of deposit.' It then 'certifies that, subject to the terms hereinafter set forth, is the registered owner of this Book Plan Investment Certificate * * * in the principal sum shown by the last net entry herein * * *, together with interest to be determined as hereinafter set forth * * *.
 
 
 18
 'Each payment entered herein and allowed to remain, will bear interest as set forth below * * *.' There followed language describing the interest obligation in a manner similar to that contained in the offering circular, and also language about 'repurchase' of the certificate in language similar to that in the offering circular. Other language dealt with transferability and limited the company's liability if it made payment to one of a plurality of 'registered owners.'
 
 
 19
 There is also in evidence certain propaganda which was apparently used by the company's salesmen in 'selling' certificates. This purports to explain how the company is insured (its accounts were not insured), how it can pay 6%, that the company's policy is to keep high cash reserves so that money will be available on request, etc. This, we think, adds nothing to the solution of the problem before us, but, when taken in connection with the report of an examination of the company that was made by the Arizona Corporation Commission, Securities Division, it does indicate that the certificate holders have been the victims of a well-organized fraud.
 
 
 20
 This court and other courts have had frequent occasions to determine whether the holders of instruments comparable to these so-called thrift certificates or book plan investment certificates are creditors in the sense in which that term is used in the Bankruptcy Act. Each case that has been brought to our attention indicates that they are.[1] It is apparent that the parties who drafted the certificates and the offering circular deliberately used ambiguous language. They speak in terms of sale and purchase and repurchase, and they call the certificate an investment. None of these terms, however, purports to or does confer on the certificate holder any of the rights of an owner of the company. None of them, in our opinion, is inconsistent with the ultimate conclusion that the certificate holder is a creditor. Bonds and debentures are sold and redeemed, and those who buy them may think of themselves as investors, yet we venture that no one would suggest that a bondholder or debenture holder is not a creditor, but is an owner. The sole liabilities of Thrift Savings under these certificates are to pay money. Part of it was to be paid as 'interest.' Part obligation to pay interest is one of the normal indicia of a relationship of debtor and creditor. So also, of course, is the obligation to repay principal, and while that obligation is in this case somewhat curtailed by the provision for payment in numerical order on the basis of requests made, it is obvious that this provision is for the protection of the corporation against demands for immediate payment that exceed readily available funds, and does not limit the ultimate legal duty of the company to pay. That obligation matured at least as early as the institution of bankruptcy proceedings.[2] Thus it is of no moment that none of the certificate holders had made written demand upon the company before the bankruptcy.
 
 
 21
 The referee and the district court based their view that the certificate holders were owners on the conclusion that the certificate holders had purchased 'securities' within the meaning of the Arizona Blue Sky Law (Ariz.Rev.Stat.Ann. 44, ch. 12 (1956)). We assume that this conclusion is correct, but we do not think that it provides an answer favorable to the further conclusion that the certificate holders are owners. The Arizona statute (44-1801 (13)) defines a security as including 'any note * * * bond, debenture, (and) evidence of indebtedness * * *.' All of these are documents which normally evidence the relationship of debtor and creditor. It is thus clear that a paper can be a 'security' within the meaning of the Arizona statute and still also be an evidence of the relationship of debtor and creditor, rather than an evidence of ownership. That, we think, is the situation here.
 
 
 22
 It is argued that we need not take an 'either/or' position here, i.e., either the certificate holders are owners or they are creditors. The suggestion is that we can hold that they are owners, inter sese, for the purposes of this proceeding, even though they may be creditors for other purposes. Moore v. American Finance & Securities Co., 1950, 31 Del.Ch. 335, 73 A.2d 47, is cited. There is a vital difference between that case and this. There, the holders of certificates were expressly entitled, subject to certain prior rights, to have the assets applied ratably to their claims upon liquidation or dissolution of the corporation. No such rights are given here. Normally, creditors come ahead of owners, and we think that the holders of the certificates in our case would, along with other general creditors, be entitled to have all assets used to pay their claims, upon liquidation or dissolution, before the owners could receive anything. In this case we cannot find any indication that the certificate holders are owners.
 
 
 23
 It happens that in this case the only substantial obligations of the bankrupt are to its certificate holders. In other cases, however, this may not be so, and we are unwilling to establish in this case, by holding that the certificate holders are in substance owners, rather than creditors, a precedent which, in another case, could be used to relegate the certificate holders to a position junior to the general creditors of the corporation. The general principle of the Bankruptcy Act is that creditors are paid ahead of owners, such as stockholders, whether common or preferred. If these certificate holders are owners, then the creditors of a company such as this would be entitled to be paid in full before the certificate holders would be entitled to receive anything. This seems to us a most undesirable result and contrary to the interests of those who may have been so foolish as to invest in a company like Thrift Savings.
 
 
 24
 2. Only those certificate holders who filed proofs of claim by October 6, 1960, are entitled to participate.
 
 
 25
 The Bankruptcy Act requires that creditors' claims be filed 'within six months after the first date set for the first meeting of creditors.' It further provides that claims which are not so filed 'shall not be allowed.' (11 U.S.C. 93, sub. n) There are provisos authorizing the court to extend the time, but those clearly do not apply to the class of claimants here involved. There is a further provision here. The language of the statute is so duly allowed shall have been paid in full, claims not filed within the time specified may nevertheless be filed, and, if duly proved, shall be allowed against any surplus remaining. There is no surplus here. Ther language of the statute is so clear that we cannot make any exception in this case.
 
 
 26
 The bankrupt corporation and the trustee in bankruptcy both had in their possession records showing who owned investment certificates and in what amounts, and it is suggested that therefore a requirement that claims be filed is of no significance in this case. Most bankrupts have books and records which disclose the names and addresses of their creditors and the amounts owing to them. The law requires that the bankrupt file a schedule of its creditors, and normally such a schedule is prepared from the bankrupt's records. That was done here, and the certificate holders were scheduled as creditors of the bankrupt. The requirement that creditors be schedules is not a substitute for the further provision of the Act that creditors' claims he proved. The reasons, we think, are clear. There are many cases where creditors, although listed on the books of a bankrupt as such, will not be able to participate on an equal basis with other general creditors. Some creditors hold security which they must first exhaust; others may not, in fact, be creditors, or they may have acquired their claims in such a manner that the law requires that they be disallowed, in whole or in part. There also may be creditors who do not appear upon the bankrupt's books at all. Thus the Bankruptcy Court is not authorized to accept the bankrupt's books or schedules as a true statement of the nature and extent of his obligations.
 
 
 27
 These and other reasons explain the Congressional requirement that a claim must be proved within a fixed time and that if not so proved, it may not be allowed. (See In re Paragon Novelty Bag Co., 2 Cir., 1943, 135 F.2d 210) The statute and General Order 21 (11 U.S.C. 93, sub. a and G.O. 21, following 11 U.S.C.A. 53) prescribe the form and content of a proof of claim. There must be at least some attempt to comply. As Judge Parker said in Fyne v. Atlas Supply Co., 4 Cir., 1957, 245 F.2d 107, 108: 'We agree that mere knowledge on the part of the trustee or of the referee in bankruptcy as to the existence of a claim is not sufficient basis for allowing the filing of an amended claim nor is the listing of the claim in the bankrupt's schedules sufficient.'
 
 
 28
 3. It may be that some certificate holders who failed to file formal proofs before October 6, 1960, can file amended claims.
 
 
 29
 In this connection, our attention is called to the following facts: In a prior proceeding instituted by the Arizona Director of Securities in the Arizona courts, in which he became a conservator of the company, and in this proceeding, which was instituted by the bankrupt under Chapter X of the Bankruptcy Act, all of the holders of certificates were represented by an attorney who appeared on their behalf in numerous hearings, including hearings before the referee in bankruptcy, and orally asserted their claims to a proportional division of the estate among such certificate holders. The certificate holders' committee and many individual certificate holders appeared at creditors' meetings and were allowed to participate as creditors. An exhibit shows that a number of certificate holders, although they did not file any proof or claim in the manner required by the Bankruptcy Act, did file their passbooks. It is not clear whether these were filed with the conservator or with the trustee in bankruptcy, nor is the date of such filing shown.
 
 
 30
 From our examination of the authorities, we take it that two propositions are firmly established: (1) that the courts will be liberal in permitting amendments to claims where an attempt has been made, within the time limit, to comply with the requirement that a proof of claim be filed; and (2) that the courts, in cases in which no injustice will be done, will be liberal in determining that such an attempt has been made. We can find no case, however, that disagrees with Judge Parker's dictum, quoted above. We think that, to begin with, there must have been presented, within the time limit, by or on behalf of the creditor, some written instrument which brings to the attention of the court the nature and amount of the claim. (See Hutchinson v. Otis, 1903, 190 U.S. 552, 23 S.Ct. 778, 47 L.Ed. 1179; Fyne v. Atlas Supply Co., supra; In re Pacific Lumber & Fuel Co., 7 Cir., 1952, 194 F.2d 995; In re Ebeling, 7 Cir., 1941, 123 F.2d 520; In re Magnet Oil Co., 9 Cir., 1941, 119 F.2d 260; In re Patterson-MacDonald Shipbuilding Co., 9 Cir., 1923, 293 F. 190.) The Fyne case goes as far as any-- and as far as we think is proper.
 
 
 31
 Thus not all of the facts relied upon by appellees would justify allowance of an amended claim by the referee. But we think that it may be proper to allow those certificate holders who filed their passbooks by October 6, 1960, to file amended claims in proper form if they so desire. This would be particularly so if they were in some way requested to file their passbooks by the Arizona conservator, or in the course of the Chapter X proceeding, or by or on behalf of the trustee or referee in bankruptcy following adjudication. They may well have believed that filing the passbook constituted a proof of claim, so that they had fulfilled the requirement of filing stated in the notice to creditors. The record does not say. It may also be that certain certificate holders who did not file their passbooks have filed some other writing that would be a basis for an amended claim. On this, too, the record is silent.
 
 
 32
 We think that the peculiar nature of this corporation, which obviously wanted to look as much like a bank or building and loan association as it could, plus the fact that it was first taken over by an Arizona conservator, may have lulled many certificate holders into a belief that their rights would be protected by the public regulatory authorities without further action on their part. For this reason, we think that the referee and the court should be liberal in allowing amendments.
 
 
 33
 We add a word of caution. The right of any certificate holder to file an amended claim must depend on the facts of his particular case. He must have taken the minimum action heretofore stated. And he must ask leave to file an amended claim. Moreover, we can find no warrant in the statute for any extension of the time for filing. It may be that those claims filed after October 6, 1960, by certificate holders who had filed their passbooks or some other sufficient writing by that date, can and should be allowed as amended claims. It may be considered desirable to notify all those who had not filed proper claims by October 6, 1960, but who had filed passbooks or some other writings, that they can ask leave to file amended claims by a fixed date. It may, on the other hand, and in view of the language of the February 23, 1961, notice,[3] be deemed equitable to confine the matter to those who did file claims in proper form by March 20, 1961.
 
 
 34
 The statutory scheme gives a priority to those creditors whose claims are duly proved and allowed. If this were not so, there would be no reason for the provision in the statute permitting the payment, in those cases where there is enough money to pay all proved and allowed claims in full, of claims not duly proved within the time limited. The effect of the scheme is to give to those creditors who do file and do have their claims allowed, rights against creditors who do not do so. These rights, and the period of time that has elapsed since October 6, 1960 should be considered in deciding what action to take in connection with the allowance of amended claims.
 
 
 35
 These matters we leave to the district court and the referee, who, for this purpose, function as a court of equity, and must also bear in mind the rights of those who did file in proper form and within time. It is of some importance that this matter be terminated within a reasonable time.
 
 In summary, we hold:
 
 36
 1. The certificate holders are creditors, not owners.
 
 
 37
 2. Those who filed claims, in due form, on or before October 6, 1960, have rights that are to be considered in determining what amended claims are to be allowed.
 
 
 38
 3. Those who filed neither their passbooks nor any other sufficient writing by October 6, 1960, are now barred.
 
 
 39
 4. The court has discretion to allow amended claims, within the limits here laid down.
 
 
 40
 The order appealed from is reversed and the matter is remanded to the district court for further proceedings consistent with this opinion.
 
 
 
 [1]
 Wilshire & Western Sandwiches, Inc. v. Commissioner, 9 Cir., 1949, 175 F.2d 718; Washmont Corp. v. Hendricksen, 9 Cir., 1943, 137 F.2d 306; Harry E. Jones, Inc., v. Kemp, 9 Cir., 1935, 74 F.2d 623; Barrymore v. Kemp, 9 Cir., 1934, 69 F.2d 335; Merchants' Nat'l Bank v. Continental Bldg. & Loan Ass'n, 9 Cir., 1916, 232 F. 828; cf. Commissioner v. Valley Morris Plan, 9 Cir., 1962, 305 F.2d 610; Jackson Finance & Thrift Co. v. Commissioner, 10 Cir., 1958, 260 F.2d 578; Commissioner v. Page Oil Co., 2 Cir., 1942, 129 F.2d 748; Helvering v. Richmond, F. & P.R.R., 4 Cir., 1937, 90 F.2d 971
 
 
 [2]
 Merchants' Nat'l. Bank v. Continental Bldg. & Loan Ass'n, supra note 1
 
 
 [3]
 'NOTICE IS ALSO HEREBY GIVEN that all creditors or other persons who hold passbooks which have not been filed with the Court or who have not filed claims with this Court must file said claims with the U.S. Referee in Bankruptcy, 125 West Monroe, Phoenix, Arizona, on or before March 20, 1961, as any claim filed after March 20, 1961 will be subject to disallowance by the Court.'